IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CHARLES SPANSEL and JANET SPANSEL PLAINTIFFS

VS. CIVIL ACTION NO.: 1:08CV1516-LG-RHW

STATE FARM FIRE AND CASUALTY CO., and JOHN DOES 1-10 DEFENDANTS

DEPOSITION OF CHARLES SPANSEL, JR.

Taken at the instance of the Defendant, State Farm Fire and Casualty Company, at the offices of Hawkins, Stracener & Gibson, 544 Main Street, Bay St. Louis, Mississippi, on July 14, 2009, beginning at 9:21 a.m.

APPEARANCES:

ROSE HURDER, ESQ.
Hawkins, Stracener & Gibson, PLLC
544 Main Street
Bay St. Louis, Mississippi 39520
COUNSEL FOR PLAINTIFFS

LAWRENCE J. TUCKER, JR., ESQ.
Hickman, Goza & Spragins, PLLC
Postal Drawer 668
1305 Madison Avenue
Oxford, Mississippi 38655

COUNSEL FOR DEFENDANT

Charles Spansel, Jr. - 07/14/2009

ALSO PRESENT: Mrs. Janet Spansel

REPORTED BY: Sherry L. Purvis, CSR #1566
Certified Court Reporter
134 Mallard Pointe Drive
Madison, Mississippi 39110
(601) 605-0229

INDEX

Style and Appearances 1-2
Index 3
Certificate of Deponent 115
Certificate of Court Reporter 116

EXAMINATIONS

Examination by Mr. Tucker 4
Examination by Ms. Hurder 105
Further Examination by Mr. Tucker 108

EXHIBITS

Exhibit No.

1 - Second Re-Notice of Deposition 5
2 - Document Entitled Important Information... 37
About Estimating the Replacement Cost of Your Home or Structure and Selecting Your Coverage Amount and Homeowners Renewal Certificate
3 - Homeowners Declarations Page 37
4 - Mississippi Katrina Resolution Form 85
5 - Letter Dated 09/28/2005 From State Farm to 90
Charles Spansel (Denial Letter)

CHARLES SPANSEL,

having been first duly sworn, was examined and testified as follows:

MR. TUCKER: Just as we begin, I presume we can have the same stipulations?

MRS. HURDER: Standard stipulations, yes.

MR. TUCKER: Absolutely.

MRS. HURDER: And plaintiffs would like to read and sign.

MR. TUCKER: Very good.

EXAMINATION BY MR. TUCKER:

Q. Mr. Spansel, I introduced myself to you just a second ago.

A. Uh-huh (affirmative).

Q. My name's Lawrence Tucker. I typically go by Lucky.

A. Okay.

Q. I'm here today as an attorney on behalf of State Farm Fire and Casualty Company.

A. Uh-huh (affirmative).

Q. And I'm here to ask you a series of questions regarding your Hurricane Katrina claim. You're here by agreement today, correct?

A. Yes.

Q. Okay. And we, in fact, filed a second

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

re-notice of deposition dated for today and for 9:00 this morning, just indicating that we would agree to be here and to conduct this deposition at that time.

MR. TUCKER: I just want to make that my first exhibit to the record.

(Exhibit 1 marked for identification.)

Q. (By Mr. Tucker) And, Mr. Spansel, I heard you say a second ago that this was your first time, so --

A. Yes.

Q. -- I understand that. And I want to just kind of go over a few of what I consider sort of the ground rules for how a deposition should proceed.

A. Sure.

Q. One is that I would ask you to give me the opportunity to fully articulate my questions before you begin to answer.

A. Okay.

Q. It'll be very easy for you to anticipate where some of my questions are going, and I know that in a conversation folks would like to sort of talk over one another. I don't mind, personally. Sherry does. It ties up her fingers. So if you can try to let me get my questions out, I promise to try to let you get your --

A. Okay.

Q. -- answers out. The other thing I'd ask is

that you answer everything verbally. It'll be real easy, again, for me to look across the table and see you nod your head yes and know that it meant a yes, but it doesn't translate so well. So if can just try to remember as we go along to say yes or no, and also to try to avoid the kind of more casual uh-huhs (affirmative) and uh-uhs (negative).

A. Okay. I'll -- okay.

Q. There you go. All right. Thank you. The last thing, I guess, is just that if you need a break at any time, just call time out. I'm perfectly fine with that. The only thing I would request is that if I've presented you with a question, you go ahead and try to answer that before you take your break. And then if you need to speak to your attorney or whatever you'd like to do, that would be fine.

A. I can do that.

Q. Thank you. Would you please state your full name and date of birth for the record?

A. Charles William Spansel, Jr.

Q. And date of birth?

A. January 4th, 1952.

Q. A fellow Capricorn.

A. Yes.

Q. Okay. Have you ever been a party to a lawsuit

before --

A. No.

Q. -- meaning either you sued someone -- you're okay -- you sued someone or someone sued you?

A. No.

Q. All right. Sometimes folks when talking about legal actions, they don't consider things like maybe a divorce. Have you ever been a party to a divorce?

A. No.

Q. Okay. And no sort of criminal problems, anything beyond just a minor traffic ticket?

A. No.

Q. Okay. Now, you told me, obviously, you have not given a deposition before. But have you ever given testimony under oath, like you're doing here today, you swore an oath to tell the truth?

A. No.

Q. Okay. In order to come and to give this testimony today, did you review any documents, do anything to prepare, such as that -- not speaking to an attorney, but something that you would have done personally?

A. No.

Q. Okay. How long have you been married?

A. 32 years.

MR. TUCKER: Is he right?

MRS. SPANSEL: Yeah.

Q. (By Mr. Tucker) Do y'all have any children?

A. Yes.

Q. How many children?

A. Four.

Q. Okay. Would you go through their names and ages with me?

A. Last names also?

Q. Yes, sir. If they're married and they have a new last name --

A. Okay.

Q. -- yes, sir.

A. Jennifer Perilloux, P-E-R-I-L-L-O-U-X, 30. Michele Spansel, E-L-E, 27. Amy Spansel -- oh, she just got married recently, Amy Spansel Despot, D-E-S-P-O-T, 25, and Jeffery, J-E-F-F-E-R-Y, Spansel, 22.

Q. Okay. And I want to tell you just to make sure I don't make you uncomfortable or unduly uncomfortable. I do want to ask you a few questions about your family and your personal life, just a little bit -- I want to try to get to know you. Part of what I want to do here today is evaluate how you would testify as a witness.

A. Okay.

Q. I'm also going to ask you a few questions -- I realize y'all have a primary residence in Kenner.

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 9

A. Right.
Q. I'm going to ask you a few questions about maybe family or friends you may have on the Gulf Coast. Just in case those people would show up on a jury, I'd want to know in advance what kind of connections you have here.
A. Okay.
Q. So just so you know where I'm going. I don't want you to think I'm just prying for no good reason. Do any of your children still live at home?
A. Jeffery.
Q. Okay. And did he live with you at the time of the storm?
A. Yes.
Q. Okay. And the home address in Kenner, Louisiana?
A. 74 Verde, V-E-R-D-E, Street.
Q. Okay. How long have y'all owned the property at Verde street?
A. 19 years.
Q. Okay. Is that property also insured by State Farm?
A. Yes, it is.
Q. Has that been true for the entire 19 years?
A. Yes.

Page 10

Q. Okay. Do Jennifer, Michele or Amy live on the Mississippi Gulf Coast?
A. Live on the Mississippi Gulf Coast?
Q. Yes, sir.
A. Amy and Jeffery stayed there most of the summer prior to the storm.
Q. Okay. Describe for me what the purpose of the house in Mississippi was?
A. A -- a paradise away from home.
Q. Got you.
A. A second home.
Q. And, I guess, the nature of my question would be like, you know, say, was it a house where the kids lived when they were in school, it was a vacation home, it was a rental property? You know, you might have had various uses for it.
A. It -- it was not a rental property. Vacation home. Every time we were there we felt like we were on vacation. It was a family getaway.
Q. Okay. When did y'all purchase that home on Sandy Hook Drive?
A. In 2000, May of 2000, to be exact.
Q. Okay. And you told me that Amy and Jeffery lived in the Mississippi home the summer before the storm. Do any of your children presently live in Mississippi?

Page 11

A. No.
Q. Okay. Do you have any relatives within just a couple of degrees who live in Mississippi, say up to maybe like second cousins?
A. No.
Q. Okay. How about any folks that you'd consider close friends that live in Mississippi, you know, whether they be neighbors at the vacation home or whether they just be, you know, folks that you have been associated with for years who have moved this way?
A. That live on a permanent basis as their primary residence?
Q. Yes, sir.
A. Primary resident, Bonnie and Paul Kiff, K-I-F-F. Adrianne and Lance. I know Adrianne prior to her marriage, so what is Adrianne --
MRS. SPANSEL: Jones.
A. Jones. And may I ask a question if I'm not sure on -- from -- to my wife?
Q. (By Mr. Tucker) I'm actually not supposed to let you do that.
A. No. Well, that's okay. There's -- there's one -- another couple, but I can't think of their name at the moment.
Q. Thanks. What I'll do is --

Page 12

A. I'm --
Q. -- I'll --
A. -- drawing --
Q. -- kind --
A. -- a --
Q. -- of --
A. -- complete blank.
Q. -- I'll kind of save that one.
A. Okay.
Q. And I'll ask again when I have the chance with --
A. Okay.
Q. -- Mrs. Spansel.
A. All right. If I recall to do that, so...
Q. Okay. And, again, the reason I'm more concerned with folks who primarily reside here is because they could show up on a jury.
A. Okay.
Q. I think that folks who might just have a second home would in all likelihood not be some --
A. Well --
Q. -- of the --
A. -- these --
Q. -- folks --
A. -- are people that would live in this area.

Page 13

Yes.
Q. Okay. Do you know which city the Kiffs live in?
A. Pass Christian.
Q. Okay. And how about the Joneses?
A. Gulfport.
Q. Okay. I want to ask a little bit about yourself. Where did you grow up?
A. New Orleans and Metairie.
Q. Okay. And what year did you graduate high school?
A. 1970.
Q. Okay. Where did you graduate?
A. Archbishop Rummel High School.
Q. Is that in New Orleans or Metairie?
A. It's Metairie.
Q. After you graduated high school, did you immediately go into work, or did you go to school?
A. School.
Q. Okay. Where did you go to school?
A. Tulane University.
Q. Okay. And what did you study?
A. Architecture.
Q. Did you get a four-year degree from Tulane?
A. I left Tulane after two years, and by my own

Page 14

choice -- I always like to kind of explain that. I actually had a scholarship to my junior year, but I chose to go into business and transferred to Loyola and graduated from Loyola University.
Q. Loyola just offered a better business program?
A. Tulane did not have an undergraduate program in business.
Q. Got you. Were you at Loyola for two years?
A. Two years.
Q. Okay. And when you were done, was the degree called a BBA, a bachelor of business --
A. Correct.
Q. -- administration? Okay. Did you work while you were in school?
A. Yes.
Q. What sort of jobs would you have held down?
A. I worked at a place called Capital Jewelers & Distributors.
Q. And can I ask what sort of work you would have done for them?
A. Retail, but management, assistant manager, different -- in different departments.
Q. Okay. Anywhere else?
A. At -- after college, no.
Q. Okay. When you finished at Loyola, and you

Page 15

earned your BBA --
A. Uh-huh (affirmative).
Q. -- where did you go next?
A. I stayed with them for a while.
Q. Capital Jewelers?
A. Capital Jewelers. Oh, let's see. Give me one moment.
Q. Sure.
A. I'm trying to --
Q. Take your time.
A. I'm not quite sure of the dates, but -- but soon thereafter I left and opened my own retail store in the French Quarter in New Orleans.
Q. Okay. What was the name of that business?
A. Burlap Bag.
Q. I'm sorry?
A. Burlap Bag.
Q. Okay. Do you still own that business today?
A. No.
Q. Okay. How long was Burlap Bag in operation?
A. Two years.
Q. And, you know, for my purposes, I'd be perfectly happy with approximations.
A. Okay.
Q. Around two years?

Page 16

A. About.
Q. No. That'll be fine. I just --
A. Okay.
Q. -- don't want you to feel that you're going to be --
A. Okay.
Q. -- held to some sort of a date there.
A. Okay.
Q. So for a couple of years --
A. Right. Correct.
Q. -- you ran and owned --
A. Correct.
Q. -- Burlap Bag in the French Quarter?
A. Correct.
Q. Okay. What did you do after that time?
A. I opened -- I moved to a bigger location, and I opened up a place called Courtview.
Q. And I guess I kind of --
A. And --
Q. -- assumed --
A. -- and they were simultaneous at -- at -- at some point. Okay.
Q. Well, tell me -- and I guess I sort of was assuming what you sold at Burlap Bag. What did you sell at Burlap Bag?

A. Hmm. Gift items and souvenirs.
Q. Okay. How about at Courtview?
A. Same thing.
Q. Okay. You said a new location. Still in the French Quarter?
A. Correct.
Q. Okay. And you ran these two businesses simultaneously for a --
A. Correct.
Q. -- period? Did Courtview then last longer than Burlap Bag? Did it --
A. Yes.
Q. -- outlive it?
A. Yes, it did. Yeah.
(Off the record.)
Q. (By Mr. Tucker) So you've got a business called the Burlap Bag, and you're running it for some time, and then you opened a new location, larger, called Courtview selling souvenir items in the French Quarter?
A. Correct.
Q. And after the Burlap Bag closed, Courtview continued to be in operation?
A. Correct.
Q. About how long was Courtview in operation?
A. You -- you are -- you're taxing my memory, but

I'm going to say approximately five years.
Q. Okay. While you were operating Courtview after Burlap Bag had --
A. Right.
Q. -- closed, did you open any other businesses?
A. Yes.
Q. Okay. Tell me what else you did.
A. I took another location, even still larger location.
Q. Changed the name?
A. Toulouse Royale, T-O-U-L-O-U-S-E R-O-Y-A-L-E.
Q. Okay. And continued along the same lines?
A. Yes.
Q. Okay. And just kind of continue to walk me through, if you will, sort of the history of the businesses. Is Toulouse Royale still in business?
A. Yes, it is.
Q. Okay. So Toulouse Royale has been consistently in business now for better than 20 years?
A. Since 1977.
Q. Okay. Better than 30 years?
A. (Witness nods head affirmatively.)
Q. Do you have any other business interests?
A. We are up to five locations.
Q. Okay. All in New Orleans?

A. All in the French Quarter, New Orleans.
Q. Okay. And, again, it's souvenir items, generally speaking?
A. Souvenirs. One of our stores focuses on pralines, and -- but to -- to generally sum it up, it's tourist type items tastefully done, not some of the things you may see on Bourbon Street, let's say, but family oriented. Yes.
Q. Okay. Got you. Not a bunch of slogan T-shirts?
A. No.
Q. Okay. Are the five locations -- is each one individually named?
A. Yes.
Q. Okay. And your primary occupation at this time is to manage these locations?
A. Correct.
Q. Okay. Other than the home on Sandy Hook and the one on Verde Street in Kenner, did you own any other real estate at the time of the storm? I'm sorry. And also other than your businesses, any residential real estate?
A. No.
Q. Okay. You purchased the home on Sandy Hook in 2000. Do you recall who you purchased it from?

A. I do not recall.
Q. Was it an individual whom you knew or had any sort of relationship with or --
A. No. It was not.
Q. Okay. How did you find out about the property?
A. Friends that live on Sandy Hook called me and said there was a location for sale.
Q. And were those the Kiffs?
A. No.
Q. Okay. Who called about that location?
A. Cindy Murphy.
Q. Okay. Do you know whether Cindy still lives on Sandy Hook?
A. She lost her house, also. It was a second home. They still own the property.
Q. Okay. Do you know who their insurer was?
A. No, I don't.
Q. Okay. So Cindy called and said there's a property nearby, and it's for sale?
A. Correct.
Q. Were you in the market, or was that kind of a cold call that surprised you?
A. I was in the market. They wanted us to join them in Pass Christian.
Q. Is Cindy married?

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 21

A. Yes.
Q. Do you know her husband's name?
A. Dr. Charles Murphy.
Q. Okay. Are they also residents of New Orleans?
A. Of Kenner.
Q. Kenner. I am sorry.
A. That's all right.
Q. Kenner. Okay. Did you purchase the home through a realtor?
A. Yes, I did.
Q. Do you recall what realtor or which realtor that was?
A. I think it was Latter & Blum.
Q. Okay. Do you recall which agent you used?
A. The listing agent, but I do not recall his name at the moment.
Q. Okay. Would you still have documents related to the purchase of the property?
A. Yes.
Q. Okay. Do you recall whether an appraisal was performed in connection with the purchase?
A. An appraisal was performed.
Q. Okay. Did you have a mortgage on the home at the time of the purchase?
A. Yes.

Page 22

Q. Okay. Would the lender have prepared the appraisal?
A. Yes.
Q. Okay. Do you recall who the mortgage was with?
A. It was a local bank. And if I heard the name, I would remember it, I think, but I do not recall.
Q. Would it be Hancock Bank?
A. No.
Q. Okay. Do you have a mortgage on the property today?
A. No.
Q. Do you still own the property today?
A. Yes.
Q. Okay. When was the mortgage paid?
A. I can give you a window. I -- I do not specifically recall a particular date or even year. Sometime between 2002 and 2004.
Q. So prior to the storm, or at the time of the storm, there was no mortgage on the property?
A. That's correct.
Q. Am I correct that the State Farm agent was Mr. Spansel -- I'm sorry -- you're Mr. Spansel -- was Mr. Saucier?
A. That's correct.
Q. Steve Saucier?

Page 23

A. Correct.
Q. Okay. Sorry. How did you come to find Mr. Saucier?
A. At the time of the purchase, the seller was insured with State Farm, and Steve Saucier was the agent.
Q. Did you actually meet with Mr. Saucier in person to discuss the procurement of insurance on the home?
A. I met with him one time when we were transferring the -- there was a question whether we're going to be grandfathered in on the ground floor. He answered those questions for us, and then we met with him.
Q. I'm sorry. Tell me what you mean by grandfathered in on the ground floor.
A. It's a two-story house, and I just wanted to make sure we -- we would have coverage on -- on first and second floor as the seller did, and he assured us that we would, and we did.
Q. Okay. So you would have had those discussions prior to agreeing to use him and State Farm as your insurer on that --
A. Yes.
Q. -- property? This home was built on a traditional slab, like a slab foundation?
A. Yes.

Page 24

Q. Okay. Not a crawl space and not an elevated home?
A. Correct.
Q. Okay. And it was a two-story home?
A. Correct.
Q. Okay. Do you have any photographs of the home prior to the Katrina loss?
A. Many.
Q. Okay. And I have some photos with us that I'm going to go through with you today. It's my recollection there are a number of shots of the interior. I don't recall if there were many of the exterior. As we go through those, that'll be one of the questions.
A. Okay.
Q. If you find that you can tell me, yeah, I've got a lot of other photos of the exterior, you know, showing the condition of the property before the storm, that's something I'd be interested in comparing and seeing.
A. Okay.
Q. Were you -- and I ask you, meaning was it you or your wife or y'all together who were responsible for procuring the insurance through Mr. Saucier?
A. Yes.
Q. You or your wife or you and your wife together?

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 25

A. Me.
Q. Okay. And did you work with Mr. Saucier to set the limits for the coverage, or how did you set upon the limits for the coverage?
A. As I recall I just went with his recommendations.
Q. Okay. Do you know whether you set the limits the same as the prior owner had had them at?
A. I'm not sure of that.
Q. Okay. I understand that the property was covered for both -- under a homeowner's policy and under a flood policy, correct?
A. Correct.
Q. Was that always the case? Since the purchase of the home, have you had both policies?
A. Oh, yes.
Q. Was the flood policy a requirement of the lender, to your recollection?
A. That would just be an assumption. I -- I -- I don't know.
Q. Some folks lived in areas where the -- in order to have the lienholder loan you the money, it was a requirement that you have the flood insurance. Some folks didn't have that requirement, but still made a conscious decision to purchase a flood policy, and I was just trying

Page 26

to --
A. Well--
Q. -- determine which was you?
A. Okay. I was concerned. I wanted flood insurance, so I was getting it regardless of what the bank required.
Q. Okay. I follow you. The home in Kenner, Louisiana -- is it also insured for flood?
A. Yes.
Q. Okay. Was the home in Kenner damaged during Hurricane Katrina?
A. Yes.
Q. Did it sustain flood damage?
A. No.
Q. Okay. Was it unlivable for a period of time?
A. Yes.
Q. How long was it in terms of months or years that you were out of the Kenner home?
A. We had -- we were able to move in based on the kitchen being completed in October of 2006.
Q. Did y'all live -- I have somewhere in my notes -- on Dean Lee Drive in Baton Rouge?
A. Yes.
Q. Okay. Is that where you resided in between the date of the storm and October of '06?

Page 27

A. Correct.
Q. Okay. Was that 900 Dean Lee Drive, Unit 406, Baton Rouge?
A. Correct.
Q. Okay. Is that an apartment?
A. It's a condo.
Q. Condo. Were you owners of the condo?
A. Yes.
Q. Okay. Did you purchase that condominium after the storm?
A. Yes.
Q. Okay. Do you still own it today?
A. Yes.
Q. So, Mr. Spansel, when you were first speaking to Mr. Saucier regarding the insurance coverage for the Sandy Hook Drive home, you knew that flood insurance was one of the coverages you wanted to procure?
A. Yes.
Q. Okay. Did you and Mr. Saucier have any conversation that you specifically recall about what the limits of the flood policy should be?
A. That I specifically recall? I recall having a conversation setting limits, but specific -- I mean, setting coverage, establishing coverage.
Q. Okay. Well, my follow-up question would be:

Page 28

Is there any point in time when you recall going back and reassessing or reevaluating the coverage limits that had been selected?
A. The spring of '05, I did go back in. I did not speak with him. There was a woman there. I -- I do not recall her name, and sat with her to discuss coverage, and we did raise our coverage at that time.
Q. Both homeowner's and flood or flood alone?
A. We discussed both. I don't recall if we raised both. I know there was some change to my coverage in the spring of '05.
Q. Okay. What prompted you to go back to the agent in the spring of '05 to discuss your coverage limits?
A. A -- a prudent homeowner.
Q. Just seemed like the right thing to do?
A. We -- we had a -- a flood claim prior, and hurricane season seemed to be a little more active, so I chose to go in and review my coverages.
Q. Okay. What I wanted to -- the reason I was asking what prompted you was, among the documents that plaintiffs' counsel produced in this case are a couple -- they are labeled Spansel v. State Farm and Bates numbered 0309 and 0310. And I just want to show those to you for a minute, and let you tell me if you recognize them, and

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

maybe if they had anything to do with your decision to go back in and reassess your coverages?

MRS. HURDER: (Examining.)

A. (Examining.) Do you want me to read this?

Q. (By Mr. Tucker) Yes, sir. If you'll take just enough time, as much time as you like, but at least enough time to identify what the documents are discussing. And then my first question would be whether you recall having seen these documents before?

A. (Examining.) I'm -- I'm curious at this date that it's prepared, March 21st, 2005, and my timing of visiting with State Farm to reassess my coverage in the spring of '05, as I had previously mentioned. I guess it's quite possible that this may have prompted me in addition to the more active hurricane activity in -- in the prior years.

Q. Sure. And so just to sort of identify what we're talking about, the document on page 309 -- it's titled "Important Information...About Estimating the Replacement Cost of Your Home," et cetera. And I believe it basically discusses that a prudent homeowner would at times determine whether or not the coverages are sufficient to replace the home in the event of a total loss and suggests that an agent can assist in accomplishing that. The document certainly speaks for

itself, but that's just kind of a summation. Would you agree that's generally what it says?

MRS. HURDER: Objection to the extent counsel is testifying.

Q. (By Mr. Tucker) I don't want you to have to summarize the whole thing for me, Mr. Spansel. Is that generally what it says?

A. It's concerning -- yeah, it's -- it's -- as I can -- I -- I didn't fully read each word, but it appears that it's urging homeowners to reassess their coverage.

Q. Okay. And, in fact, does it say that "If you are unable to obtain a detailed estimate from either of these sources" -- it's giving a couple of sources -- that "your State Farm agent can assist you in" doing that?

A. (Examining.) From either of these sources? I'm going to look where the -- where the sources are. Estimates of the home -- "replacement cost can be obtained from a building contractor or a replacement cost appraisal. If you are unable to obtain a detailed estimate...your...agent can assist you..."

Q. And my question, Mr. Spansel, is only that not only did it alert you to the fact that you might want to review your coverages, it also alerted you to the fact that a State Farm agent could assist you in that, correct?

MRS. HURDER: Objection, misquoting the

witness.

Q. (By Mr. Tucker) Is that your understanding of what the document's telling you? It's not a trick question. I promise.

A. (Examining.) I mean, it -- it clearly states "your State Farm agent can assist you..."

Q. Right.

A. Yeah.

Q. It says that, right?

A. (Witness nods head affirmatively.)

Q. Very good. You see I have trouble -- there's a lot of things I'd like to just say, but I really got to try to get you to say them, and so it helps me. That's what the document does say, in fact, it directs to -- if you don't find another source, you can visit your State Farm agent, correct?

A. Which I did.

Q. Yes, sir, which you did. And the other document, number 310 -- and this was just talking about replacement cost like that first document did -- lists other available coverages, does it not, optional coverages that you could include in your policy?

A. (Examining.)

Q. And I promise you I have a reason for asking you these questions.

A. I'm sure you do. (Examining.) This document does address the availability of additional coverages.

Q. Okay. And one of the additional coverages that I just happen to know is part of this homeowner's policy was called jewelry and furs coverage. There was $2,500 of coverage available, and that's what you consider an additional coverage. My question is, do you recall whether that additional coverage was something that you had in 2000 or something that you added later on down the line?

A. You're -- you're asking me jewelry and furs specifically?

Q. Yes, sir. That's an additional coverage that's parts of your homeowner's policy.

A. I do not recall if I have jewelry and fur coverage.

Q. Okay. Sorry. I guess I sort of assumed something there, so let me go back. I just want to pass to you a document. It's a homeowner's declaration page for the 12-month policy period from May 4th, 2005, to May 4th, 2006. And it's going to show limits of liability, and it also shows some additional coverages available on your policy, and it is plaintiffs Bates number Spansel v. State Farm 0307.

MRS. HURDER: (Examining.)

Q. (By Mr. Tucker) Mr. Spansel, that document, as I said, is what's called a declarations page. It's sort of a summation of what the coverages are. You'll note on the left hand side at the very bottom there, there's an optional coverage available for jewelry and furs.
A. (Examining.)
Q. I believe it's a 15 for an individual item, 2,500 for the aggregate whole. Would you agree that that coverage is available under -- at least it's what reflected on this declarations page?
A. (Examining.) Yes, as -- as printed here. Yes.
Q. Do you recall at any time requesting that additional coverage?
A. No. I do not recall that.
Q. Okay. Would there have been any jewelry or furs in the home at the time of Hurricane Katrina?
A. There were no furs. There was some jewelry, but nothing of any significance.
Q. And that's kind of -- it's a second home, a vacation home.
A. Uh-huh (affirmative).
Q. I would not expect you to keep a lot of valuable jewelry in a home that you didn't primarily reside in. But that coverage was available under your policy, and so my -- yeah, that is my question, and I --

go ahead.
A. When -- when you say available, I actually had that coverage?
Q. Yes, sir.
A. Okay.
Q. Yes, sir. And, again, the other documents we showed you -- one prompted you to reevaluate your replacement cost coverage. You went and you visited with your agent, and you reassessed your limits in the spring of '05, correct? The other one -- it mentioned additional coverages. I thought quite possibly you went and discussed things with your agent. Maybe there was a decision to include a coverage like jewelry and furs because something of that nature was being stored at the house. And that's all I really want to confirm is whether there were jewelry and furs stored in the home that were lost during Katrina?
A. To clarify this, you could go back to my earlier policies and see if that was on there.
Q. Yes, sir.
A. All right. I do not recall when that was added. Okay.
Q. You also -- if I understand correctly, you told me that you didn't have any furs at the house, and that any jewelry would have been of a small value?

MRS. HURDER: Objection, misquoting the witness.
Q. (By Mr. Tucker) You tell me if it's a fair characterization or not.
A. A small value. No, I said nothing significant. Okay.
Q. Tell me what nothing significant means. If it doesn't mean small value, what does it mean to you?
A. I think I would have to sit down with my wife and prepare a contents list.
Q. Okay. Is that something that you've done, prepared a list of contents lost in this home that you owned and had stored there at the time of Hurricane Katrina?
A. Not a detailed list.
Q. Okay. So you have prepared a list, just not a detailed list?
A. Correct.
Q. Anybody at State Farm in connection with this claim ever request a contents list from you?
MRS. HURDER: Which claim?
A. In -- in regards to this claim?
Q. (By Mr. Tucker) Well, in regards to your Hurricane Katrina claims. I don't mean necessarily under your flood policy or your homeowner's policy. Was a

contents list asked of you following Hurricane Katrina dealing with the Mississippi property?
A. Not a specific list, but we did discuss contents over the phone. He was -- it was generalized categories.
Q. Was that in connection with the adjustment of the flood loss?
A. That's correct.
Q. Okay. And, in fact, were you paid the limits available to you for your flood contents loss?
A. That is correct.
Q. Okay. And were those limits, in fact, $100,000?
A. That's correct.
Q. Okay. And were you also paid the dwelling limits, structural limits available to you under your flood policy?
A. Yes, we were.
Q. And were those limits, in fact, $148,400?
A. Yes, they were.
MR. TUCKER: Okay. Let's do a couple of things, just housekeeping. Can I attach nine and ten collectively, and then we'll attach the declaration page separately?
MRS. HURDER: Yes, you may.

(Off the record.)

(Exhibits 2-3 marked for identification.)

Q. (By Mr. Tucker) When you said that you prepared a general list of lost contents, was that something that you then submitted to State Farm?

A. No.

Q. Is it something that you have turned over to your attorneys?

A. No.

Q. Okay. As we go through -- and I'm trying to make notes -- frankly, Mr. Spansel, I think y'all probably have some more information that would be helpful to me that's not yet been produced. And so I'm going to try to keep a going list, but I'm going to ask that you find these things. Turn them over to your attorneys. Give them the opportunity to review them and submit them to me. Something like photographs, a list of lost contents, even a general one, an appraisal, documents related to the purchase of the home -- those would all be things that would assist me and my client in trying to evaluate the claim. So my request to you is to find those documents, present them to your attorneys, and then, hopefully, they can get them to us.

A. Specifically the contents, my attorneys do not have. It was never asked of me to provide that. They do

have the documents concerning my home. Okay.

Q. All right. Thank you.

A. And the appraisal. Yes.

Q. Okay. In listing the contents in the general itemization, did you assign dollar values to the loss, or were you merely trying to, you know, create a list of items, or was it a list of items and values? What did you do?

A. For the flood claim?

Q. No, sir. You said that you prepared a general list that hasn't been presented yet of your contents losses.

A. Okay.

Q. Correct?

A. Correct.

Q. Okay. My question is: If I were to see that list right now, would it have values for the losses, or would it just list a bunch of items that were lost in the storm?

A. It would have some values.

Q. Okay. Did you prepare that list personally, or did Mrs. Spansel prepare it?

A. I -- I prepared it.

Q. Okay. How would you arrive at the values included on a list like that -- included on your list?

A. I would imagine some items would be purchase price, and some would be replacement price where I did not recall the actual purchase price.

Q. And in order to determine that, did you do some Internet research or look in catalogs, go to stores?

A. No.

Q. How did you determine, where you couldn't recall your purchase price, what a replacement cost would be?

A. Let me address that this way: That after the hurricane when the flood adjuster, which was with State Farm, called and wanted to address the content part of my coverage, together over the phone, we -- we estimated, to the best of my knowledge at the time and he did not want details, and we arrived at a number well over the $100,000 coverage. At which time he said, stop, that's enough, so I stopped. And he, once again -- I think he -- if I recall correctly, he gave me seven categories -- appliances, electronics, linens, upholstered furniture and so on. It -- it may have been more than seven, and I estimated the value of those items. I -- I was -- my homeowner's claim was denied by State Farm, so the list that I was preparing -- this more specific list or detailed list was never followed through because of the -- my claim being denied. So I did not spend a lot of time

on the Internet or looking for receipts or going through credit card accounts or a checking account trying to come up with that list. If it's required of me now, I'll do that.

Q. Okay. Well, let me ask you this: I mean, we've got here as Exhibit No. 3 a declaration page that shows the coverages available for the period that includes Hurricane Katrina.

A. Uh-huh (affirmative).

Q. If you'll look here under B, coverages and property, you'll see coverage B that says -- I believe it says contents or personal property. I believe the limit is $103,725. Do you recall that being the limit of contents available to you under your homeowner's policy?

A. Do I recall? No. I don't -- I don't have my coverages memorized.

Q. Okay. But in the spring of '05, you adjusted your coverages upward -- some coverages you adjusted upward?

A. Yes.

Q. Okay. Do you recall revisiting your contents coverage?

A. I don't recall any specific -- any specific adjustment. I went into -- into the office to sit down with my agent -- at the time was not there. And this

woman, which I can't remember her name, represented my agent. We sat down. I told her my concerns, and there was some adjustments made. I don't recall the specific adjustments.

Q. Okay. When you say I told her my concerns --

A. Concerned that I may be underinsured, and we raised coverages. We did not lower coverages. Yes.

Q. Okay. Did you have anything such as an appraisal or anything in hand that you were using as a guide to help you determine whether you were underinsured or not?

A. No. I did not walk in with any documents.

Q. Okay. After your purchase of the home -- we discussed earlier your purchase, and you told me that an appraisal had been prepared as part of the purchase.

A. Correct.

Q. Was there ever another appraisal of the home between 2000 and the date of loss?

A. No.

Q. Was there ever any sort of appraisal as to the value of the contents or the personal property contained in the home?

A. No.

Q. Okay. Since the date of loss, has there ever been any sort of appraisal as to the value of the lot?

A. No.

Q. Am I correct that the home has still not been rebuilt?

A. That is correct.

Q. Okay. You told me as you were discussing the general list prepared in connection with your conversation with the flood adjuster that it exceeded the $100,000 in coverage available?

A. That's correct.

Q. You have any estimation for me as to what the value of the lost contents would be?

A. I'd think without sitting down specifically and -- and trying to remember each and every item, which would be difficult, but we -- we were in the house five years, so we did accumulate an abundance of property. It was a two-story house. I certainly can work to get an accurate number. Yeah.

Q. You understand where I'm coming from, don't you --

A. You --

Q. -- in --

A. -- would --

Q. -- asking --

A. -- like to --

Q. -- that --

A. -- know a --

Q. -- question?

A. -- number. And --

Q. Yes --

A. -- I --

Q. -- sir.

A. -- certainly fully appreciate that. Yes.

Q. I just wanted to make sure you didn't think anything other than it's a reasonable --

A. Oh, it's --

Q. -- question for me to be asking.

A. -- it's a very reasonable question. I agree.

(Off the record.)

Q. (By Mr. Tucker) When you purchased the home, did you purchase it, if you recall, above or below its appraisal value?

A. Below the appraisal value.

Q. Okay. Was it significantly below, or do you recall the amount below?

A. I recall the exact figures, if you would like those.

Q. Absolutely.

A. Okay.

Q. Thank you. I didn't want to put you on the spot, but that's what I'd love, so... What was --

A. The asking price was 285. The purchase price was 260, 260,000, and the home appraised for 319,000.

Q. Do you recall how much the mortgage was on the home?

A. 208,000, give or take a couple thousand.

Q. Okay. Do you have any recollection as to the value of the lot as opposed to the value of the home located on the lot?

A. Although I -- I -- the house was located on Sandy Hook, I -- I think the proximity of the house to the bridge -- and when I say the bridge, Bay St. Louis Bridge -- made that piece of property less desirable. I would estimate at that time $100,000.

Q. Okay. At the time of the storm --

A. Yes.

Q. -- according to Exhibit 3 --

A. Uh-huh (affirmative).

Q. -- coverage A for the dwelling is $138,300. That was the amount available for the main structure of the home. You stated to me that you thought the mortgage at one point was over 200,000, 208,000 to be exact. Had you never had the home fully insured?

MRS. HURDER: Objection. Putting words into the witness's mouth.

A. I -- I looked at my flood coverage. I looked

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

at my homeowner's coverage. It looked pretty good to me.

Q. (By Mr. Tucker) Okay. In the event that a fire had broken out at the home, and the home had just burned to the ground, you would have looked to your homeowner's coverage in that instance, would you not?

A. Correct.

Q. Okay. And at 138-some thousand dollars for the structure, do you feel that you had enough insurance?

A. I would have been left with a slab, and there was some cement structure on the ground floor. But it's quite possible I -- I would have been underinsured in that particular instance.

Q. And you don't ever recall lowering the amount of your homeowner's coverage at any time?

A. No.

Q. Okay. And the only reason I ask is I would have suspected if you had a mortgage of 208,000, give or take, that you would have needed at least 208,000 in coverage. But I assume then some of that is the value of the land, so I just wanted to be sure. It seemed to be a pretty big gulf between the numbers we're talking about here, and what I'm seeing there, but...

A. Well -- well, those are the -- those are the accurate figures as I remember them. Initially, there was a mortgage. I ended up paying off the mortgage. Well, I

guess we would have to look back to what the banks required. I do not recall lowering.

Q. Okay. Tell me this: At any time during the ownership of the home, did you ever attempt to sell it?

A. No.

Q. Okay. Did you ever receive any unsolicited offers to purchase the home?

A. No.

Q. Okay. Did you ever investigate what the value might have been, say an appreciated value of the home during the five years before Katrina?

A. I -- I was certainly aware of some other properties, some other homes that were selling in the area, so -- but not specific -- our -- our neighbor had a sale on his home, but -- so I was aware of some increased value.

Q. Okay. When y'all purchased the home in 2000 --

A. Uh-huh (affirmative).

Q. -- did you have furniture that you were able to move in at that time, or did you begin to acquire furniture for the home?

A. When we took possession in May of 2000, we did an extensive renovation to the home. If I recall correctly, it wasn't till maybe October that we actually started moving in furniture. And we -- we purchased a

great deal of furniture, but it -- it also -- we also accumulated other pieces as we went forward.

Q. Okay. Can you help me -- a description of what your renovation -- the extensive renovation consisted of?

A. It -- it seems a little mundane, but I -- I will -- we -- we -- we removed wallpaper. It -- it was a very dated house, so there was plaster work, sheetrock work. We added -- we -- we moved a wall, added a wall, replaced the windows, expanded the porch, a little kitchen renovation, fully painted the interior and exterior, repaired and refinished hardwood floors, put in a new stairwell, lighting, replaced almost all of the lighting, both interior and exterior. It was a major undertaking. Yes.

Q. Did you do any of the work yourself?

A. No.

Q. Do you recall who you -- did you hire, say, a contractor or a builder who then hired other people to do the work?

A. We had -- we had many contractors, electrical, plumbing, carpentry, brought in a floor specialist or -- yeah.

Q. I guess what I'm asking is whether you -- and I think you're telling me you did -- whether you acted as your own general contractor, found your own subcontractors

and put them to work?

A. I -- I -- I had a general contractor, I guess, by the name of Bill Nugent.

Q. Okay. Nugent?

A. Nugent, uh-huh (affirmative).

Q. Okay. Do you know whether Bill is still in business?

A. He's retired.

Q. Okay. Do you know what the name of his company was?

A. William Nugent Construction.

Q. And I'm asking because my next question is, do you recall how much all of these renovations costs?

A. You know, at the -- I'm going to say it's in the -- the -- the range of 65 to $70,000.

Q. Okay. Did you have to take an additional loan from the bank in order to perform the renovations?

A. Not -- not that I recall.

Q. Okay. The property was insured at the date of your purchase, obviously, in May of 2000?

A. Correct.

Q. You would have had insurance at the --

A. Oh --

Q. -- closing?

A. -- yes.

Page 49

Q. Did you reassess the limits of the coverage in October 2000, around the time of the move-in, given the 65 to $70,000 invested in the property?
A. What specifically was the question? Did I --
Q. Did you revisit whether the insurance coverage was adequate and sufficient in light of the other 65 to 70,000 that had been put into the home?
A. Not that I recall.
Q. Okay. And, frankly, Mr. Spansel, just like in the contents question --
A. Right.
Q. -- what I'm trying to discover is what the value was at the time of the loss, and so I'm just looking for as much information as I can gather, so...
A. (Witness nods head affirmatively.)
Q. Okay. Were there any extensions on the property? And what I mean by that is like outbuildings, other structures pertinent to the property, to the main home?
A. We just had completed a gazebo in June of 2005.
Q. Describe the gazebo for me in some detail.
A. It -- the dimensions were 20 by 16 or 20 by 18. Can't quite remember. Only had it for a couple of weeks. It was made out of lumber, pressure treated lumber. It -- it -- it had six supports and a roof also made out of

Page 50

lumber. We did run electrical out to it. Also, I had a boat shed with a lift and -- and a pier and all of that.
Q. Okay. Was the gazebo built on a concrete foundation?
A. They -- I -- I think it had -- no. It had concrete piers. Yeah.
Q. Was the gazebo elevated where you had to walk up some steps to get to it?
A. Yes.
Q. Okay. Do you recall how many steps up it was?
A. Two.
Q. Okay. And the piers driven into the ground then were -- there was concrete around the base of those piers?
A. Yes.
Q. Okay. And was the roof covered in shingle?
A. The roof was not fully covered. It was a -- let me think of the word here. Can't think of the word. It was not fully covered. It was like a crisscross pattern to filter the sunlight.
Q. Oh, I follow you. Would rain have come through the roof?
A. Yes.
Q. Okay. Like a lattice?
A. Lattice.

Page 51

Q. Okay. Do you recall the cost of constructing the gazebo?
A. At the time that we -- that I contracted for the gazebo we also did some work on the -- on the pier. But limiting it just to the gazebo, I think we would be talking in the neighborhood of 9 to $10,000.
Q. Okay. Would Bill Nugent have built the gazebo?
A. No.
Q. Okay. Do you recall who did the work on the gazebo?
A. Louis Lassabe.
Q. Is he similar to Mr. Nugent, a gentleman who owns a construction company?
A. Yes.
Q. And do you recall the name of his company?
A. Just knew it as Louis Lassabe.
Q. Okay. Was he local to Pass Christian?
A. Yes. Well, not to Pass Christian, but to Gulfport.
Q. Okay. Do you recall where Mr. Nugent was out of?
A. Gulfport -- a correction. He lives in Gulfport today. At the time that he did the work he was in Bay St. Louis.
Q. Okay. When you purchased the property in 2000,

Page 52

was there already a boat shed lift and pier on the premises?
A. Yes.
Q. Okay. Did you perform some renovations to the boat shed?
A. Not to the boat shed, but to the pier. We expanded the pier twice.
Q. Okay. Do you recall -- I presume once was around June of '05?
A. (Witness nods head affirmatively.)
Q. You told me that you also did some work on the pier.
A. Correct.
Q. Well, when was the other time that the pier was expanded?
A. In June of '05, we did a high pier expansion. Prior to that we did a low pier expansion. 2003, as an estimate. I don't recall the exact time that we did that.
Q. That's fine. Do you have any estimate as to how much money was invested in the expansions of the pier?
A. I apologize for my stomach --
Q. No, that's okay.
A. -- growling.
Q. I was about to suggest we might take a break. And so if you tell me you have an estimate, we can call

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 53

time out.
A. Okay. Estimate on the expansion? Let's see. Well, the -- the low pier expansion I'm going to say was $6,000, and the high pier expansion at the time of the gazebo was maybe $7,000.
MR. TUCKER: Okay. Let's take a break.
(A short recess was taken.)
Q. (By Mr. Tucker) Mr. Spansel, I want to show you one thing that's been submitted to us in the course of this litigation. It's titled "Plaintiffs Responses to Defendant State Farm Fire and Casualty Company's First Set of Interrogatories." And I just want to ask you to take a look at that with me, and I'll ask you a few questions about it once you've had a chance to sort of review it.
A. Okay.
MRS. HURDER: (Examining.)
Q. (By Mr. Tucker) Generally interrogatories -- what occurs is we propounded some questions that we wanted answered, and then we've received responses back to those questions. So you'll see an interrogatory and then a response. We propounded the interrogatory. Your counsel provided us with these responses. You don't have to --
A. Okay.
Q. -- read every one. I'll draw your attention to a couple.

Page 54

A. Okay.
Q. But generally my first question would be have you ever seen these interrogatories before?
A. Have I ever seen them? No.
Q. Okay. And that's fine. I mentioned to Edward earlier they're unsigned. I asked him to secure signatures. I believe that will happen at one of our breaks, so you'll have an opportunity, Mr. Spansel, to read each one individually, and what you'll be asked to do is verify that these answers are your answers.
A. Okay.
Q. What I'm going to ask you about in particular is interrogatory number 21, and --
A. Uh-huh (affirmative).
Q. -- this is going to follow up on some things we've been talking about. You'll see there there was a question posed in number 21 and an answer provided. You'll see that the answer mentions that three to four months before the storm you visited with a female employee of your agent, Mr. Saucier --
A. Uh-huh (affirmative).
Q. -- and that flood limits were increased. You know, we've talked a few times, now, about what happened at that meeting with the agent --
A. Okay.

Page 55

Q. -- and your recollection was a bit vague as to what coverages changed or didn't change. The representation here in your interrogatory responses is that your flood coverages was increased.
A. Well, I --
Q. Does this refresh your recollection at all? Go ahead.
A. I can specifically say that my flood coverage was increased. I have -- I have a good recollection of that because I experienced a -- a flood at the property a year or two prior. My point of going in was to review all my coverages, but I do recall specifically increasing flood.
Q. Okay. Do you recall whether during the course of that meeting there was any discussion about the renovations that we identified that Mr. Nugent performed, or the gazebo, if it maybe wasn't even in existence yet, but plans to build additional structures on the property, anything of that nature?
A. At the time of the meeting, there were -- there were no plans to -- to build additional structures, I -- I recall. Did I address the -- the improvements made? I don't know if I addressed the specific improvements. I guess, yeah, overall, you know, I -- my house was worth more money. We had more stuff in it, contents, and my

Page 56

intention was to make sure I was covered.
Q. Okay. We can just leave these aside for now --
A. Okay.
Q. -- unless -- if you want to review them, you're welcome to. But we can move them aside for my purposes. My question now is about the prior flood.
A. Okay.
Q. Was that in connection with a prior hurricane that had occurred?
A. I'm going to have to think -- in thinking back, this was a September, say, a 2002 event, and it was at a time when there was one kind of following another within a four-week span. In -- in the -- the first one that affected the Pass Christian area, we actually had 19 inches of water in our -- our ground floor. I do not recall the specific name of the storm. Yeah.
Q. Were you affected then by a subsequent event, also, a subsequent hurricane or storm? You said there was a series of them.
A. There was a second storm or hurricane that also produced a rise in the tide four weeks after the initial claim.
Q. And did that rise in tide push water into the living structure?
A. Yes.

Page 57

Q. Okay. Do you recall how much water went into the home at that time?
A. It -- it was -- we -- we had no real way to tell because the damages of the first incident -- we were -- we did not make the repairs yet, so I could not tell. It just made things a little messier.
Q. Is it your belief that less water got in on the second occasion than on the first?
A. I -- that would be a guess. Sorry.
Q. State Farm was your flood -- they administered your flood policy at that time?
A. Correct.
Q. Describe for me your contacts with State Farm in regards to that flood claim. You obviously called and alerted them to the fact that you had a claim.
A. Correct.
Q. What would have been the next thing that happened?
A. I would -- someone eventually showed up at the house -- an adjuster. I don't think he was local. Maybe out of Oklahoma or Texas, and he assisted in evaluating the claim.
Q. Okay. Do you recall what sort of things -- well, were you present while he was at the property?
A. Yes.

Page 58

Q. Do you recall what sort of things he did?
A. I'm -- I'm not sure I follow the question, but --
Q. Sure. I can ask it a different way.
A. Okay.
Q. For example, did he take measurements and draw a sketch and photograph?
A. Yes.
Q. Okay. Other than measurements, a sketch and some photographs, do you recall anything else that he did while he was at the property?
A. He reviewed the contents. I -- I don't recall anything else specifically. No.
Q. I think a sketch, photos and measurements --
A. Yeah.
Q. -- pretty standard, and you said he reviewed the contents. Do you mean that he -- the contents were all still in the home, correct?
A. Some were still in the home, and some were pulled out on the driveway that were unsalvageable, but he -- he -- I made everything available to him to review.
Q. And that would be different than the Hurricane Katrina loss where the items simply just didn't exist anymore?
A. Exactly.

Page 59

Q. Okay. Did you deal with anyone other than the single adjuster in handling that claim?
A. I don't believe.
Q. Okay. Was that adjuster polite and professional with you?
A. Very much so.
Q. Okay. Were you satisfied with the way that State Farm handled that loss?
A. Yes.
Q. Okay. Other than this flood claim that -- or the two flood claims that we're discussing right now, have you had other claims under homeowner's or flood policies with State Farm in the past? Could be on the Kenner, Louisiana, home, one of your businesses, anything, just other claims.
A. I had no other claims on the Sandy Hook property. On the Verde property prior to Katrina we had one wind claim that drove some water in and gave us a little bit of first floor roof damage, minus my deductible. Maybe there was a -- I collected $2,100 or something like that.
Q. Okay. Same question on this one is: Were you satisfied with the way that State Farm handled that wind loss at the Verde property?
A. Yes.

Page 60

Q. Are your businesses insured by State Farm?
A. No.
Q. Okay. State Farm also insured the Verde property at the time of Hurricane Katrina, correct?
A. Correct.
Q. After you made contact with State Farm and alerted them to the claim in Kenner, were you then contacted by an adjuster?
A. Yes.
Q. Okay. Did that adjuster conduct an inspection of the property?
A. Yes.
Q. Were you present for the inspection?
A. Yes.
Q. Okay. In describing what the adjuster did at the Verde property at Hurricane Katrina, anything different than what we described for the earlier flood claim at Sandy Hook, being a sketch, photos, measurements, reviewed contents losses at the site?
A. In reference to that, that was pretty much standard procedure. Yes.
Q. Okay. And that was your experience at the Verde property at Hurricane Katrina was that the same procedure you had witnessed at the flood claim in Pass Christian -- the same procedure followed now Hurricane

Page 61

Katrina at Kenner, Louisiana?
A. Same procedure, yes.
Q. Okay. The gentleman who adjusted that loss -- pleasant, courteous, professional with you?
A. Yes. But -- but I would have to expand on that. My -- my Katrina claim with State Farm on my Verde Street property was a difficult process. If I recall, I had five adjusters. I -- I'll leave it at that.
Q. Well, I'll ask you a couple of follow-up --
A. I'm sure --
Q. -- questions.
A. -- I'm sure you will.
Q. Are you telling that at the end of the day you're not satisfied with the way that State Farm handled the Verde property loss?
A. I described to you earlier that I was back in my property in October of 2006.
Q. Yes, sir.
A. I did not receive my final payment till February of 2007. I was not very happy.
Q. Okay. Did you ever retain an attorney to represent you in regards to the Verde property?
A. No.
Q. Do you understand what the final payment was for in February of '07, like what it represented?

Page 62

A. It represented the loss of -- of contents and the dollars that it took to make me whole.
Q. My question, I guess, is this: One of the things that is sometimes withheld initially is what's called depreciation, so if you have -- and some items are depreciated, and then when they're replaced, you get another check that represents the difference.
A. I did get that. That is not the check that I'm referring to. I'm referring to a substantial -- a substantial payment for the home repair and -- home repair.
Q. Well, what's your understanding of why the process took so long? Do you have an understanding as to why it took so long?
MRS. HURDER: Objection.
A. I wish I knew.
Q. (By Mr. Tucker) Okay. Let me ask just sort of a related question then. Did State Farm request some information from you that they were -- represented that they were waiting on in order to make this payment?
A. No.
Q. Okay. From your perception, did it appear that that payment should have been made much earlier?
A. Yes. It was a fight at every step.
Q. Okay. And I believe you told me earlier, just

Page 63

to be sure, this is a wind only claim?
A. Wind only.
Q. Okay. There was no flooding in --
A. No --
Q. -- that --
A. -- flooding.
Q. -- area? Okay. The amount that you were ultimately paid on the Verde property -- was it sufficient to repair that structure?
A. Yes.
Q. And the amount that ultimately you were paid for the contents at that property, was it sufficient to replace the lost contents?
A. Yes.
Q. Okay. What I'd like to do is -- I have quite a few color photos -- and I'd like to go through them with you. I just want to discuss various things, who took them, when they were taken, what they reflect.
A. Okay.
Q. It's quite a lot of them, so it make take us a little time, but I would like to go through them as best we can.
A. Okay.
Q. They were produced by the plaintiffs in this case. They're Bates numbered Spansel v. State Farm 0311,

Page 64

and they proceed sequentially through 0380.
MR. TUCKER: Take a look.
MRS. HURDER: (Examining.)
Q. (By Mr. Tucker) Mr. Spansel, if you will --
A. Uh-huh (affirmative).
Q. -- do you already know whether you are the photographer who took these photos?
A. I'm the photographer of this first page I'm looking at.
Q. Okay. What I'm going to ask you to do is flip kind of through there, and if you see some photographs that are not yours or maybe a set of photographs that aren't yours, and you can tell me, hey, starting here we've got a different photographer. Would you do that for me?
A. (Examining.) This photo doesn't appear to -- it belongs in -- in this series. I mean, that's -- I'm trying to figure out what the heck that is, but I -- I did not have any house left, so I don't know what that is.
Q. It looks to be some sort of a mold growing in the corner of a wall and roof, but you're on page 315. And y'all didn't have wall or roof left?
A. No.
Q. Okay.
A. (Examining.)

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Q. Is that your son, Jeffery --
A. Yes, it is.
Q. -- on the top photo on 316? And I think he shows up in a few, so I just wanted to be sure that I knew that was him.
A. Okay. On 36 -- 16 I'm -- I'm no longer on my property. This is a picture of the bridge. This is not my property. It's a friend of mine. The --
Q. Whose property is that?
A. Lee Larrieu. This is not my property. This is just some -- something that was -- we found along Sandy Hook.
Q. Okay. And that's on 317. And then the other person in the photo with Jeffery is Janet, correct?
A. Correct. (Examining.) We walked the neighborhood and took several pictures. This -- this is not my pier, and I do not recall whose pier that is.
Q. We're on 318.
A. (Examining.) It -- it -- looking at the picture below, I do recall now this is Lee and Stephanie Larrieu's property that we walked over to and photographed pictures with them. This is Stephanie Larrieu with my -- my wife on their property.
Q. On 319.
A. (Examining.) This is still taken from their

property. I am back on my property on 321. (Examining.) I haven't visited this in a while. This is --
Q. Sure. Take your time, and if you need a break, just let me know.
A. (Witness cries.) (Examining.) 346 is not my property. Beginning with -- well, 351 and 352 is pre-Katrina before the gazebo because the gazebo was where those two chairs are. (Examining.)
Q. These contents items --
A. These are contents.
Q. Are they first floor?
A. Let's see. 353 and 4 are first floor. 355 is second. 56 second. 57 is second. 58 is up and down. This is down. 360 -- this is up. I mean, this is the -- the top photo is downstairs. The bottom photo is upstairs, and this is upstairs -- the kitchen. I mean, I can -- I can continue and -- and point out up and down, but this was down, this was up.
Q. Well, tell me this --
A. Yeah.
Q. -- for a second, Mr. Spansel. What was the down, first floor -- what rooms were there, and what were they used for?
A. Downstairs was a -- a entranceway, a laundry room, a garage, a den, a kitchenette and a playroom.

Q. And tell me what the second floor then comprised.
A. Second floor was a outdoor porch, screen porch, covered porch, den or living area, dining area, kitchen, master bedroom with bath, two additional bedrooms and a full bath. (Examining.) Upstairs, downstairs -- so it -- both of these are up. That's the set of stairs that we put in. On page 372 there's a picture of Bonnie and Paul Kiff that I just mentioned earlier.
Q. Yes, sir. Is that at their property or yours?
A. It's my property. They lived across the street. (Examining.) I don't -- do not recognize 380.
Q. When you said you don't recognize it, you don't recognize that --
A. Well, it's --
Q. -- location?
A. -- not -- it's not my property, obviously. It's -- it's somewhere along Sandy Hook there.
Q. Okay. Do you believe to have been the photographer for all of these photographs?
A. Yes.
Q. Okay. Thanks. Let me take a look and see if there's a few I might want to select and --
A. Sure.
Q. -- ask you questions about.

MRS. HURDER: Did you want to take a break?
THE WITNESS: I'm okay.
Q. (By Mr. Tucker) Any time, you just let me know.
A. I'm fine.
Q. On 313 here -- is this at your property?
A. Yes, it is.
Q. Okay. Those stairs -- if the home had been standing, what stairwell was this? Is that leading up to a front door, for example, or --
A. If you were entering from the driveway, you would have entered the ground floor foyer and walked up the set -- set of stairs that I pointed out earlier. If you went around to, quote, the front of the house, the water side of the house, you would have entered these stairs on to a covered porch and then into the premises, so it would be a second floor entrance. Yes.
Q. There would not have been a first floor entrance on that side, right?
A. Oh, yes, there -- there -- there was a sliding door under the porch.
Q. Oh, okay. All right.
A. Under this structure, there was a sliding glass door into the playroom.
Q. Okay. Would you agree that the photos we

Page 69

looked at, although we saw some interior photos --
A. Uh-huh (affirmative).
Q. -- we didn't really see a nice exterior shot of the home before the storm?
A. No. There was not a exterior shot of the home before the storm, but I do have them.
Q. That would be great.
A. Yes.
Q. If you have some where we could see pretty clearly what it looked like before the storm --
A. Okay.
Q. -- I'd appreciate that. And then, further, if you have any that are like, say, pre-renovation, post-renovation from that early purchase -- or, you know, that early renovation, I'd appreciate that, as well.
A. (Witness nods head affirmatively.)
Q. On 317 -- I don't think we've gotten to the LaRose property yet, have we, that's here on 318?
A. We haven't gotten to what property?
Q. Isn't this the LaRose property or your friends'?
A. Their name is Larrieu, L -- L-A-R-I -- L-A-R-R-I-E-U.
Q. Okay. I'm sorry. 318 -- these are the photographs of the Larrieu property, correct? That's

Page 70

where they begin, and then Mrs. Larrieu --
A. Correct.
Q. -- is here? On 319?
A. Correct.
Q. Okay. Here at the bottom of 317, my question was going to be whether that was your boat?
A. No.
Q. Okay. That's not your boat dock or boat shed as you described it?
A. That is a random picture further up Sandy Hook.
Q. Okay. Was there any of your pier, boat shed or lift -- did any of that survive the storm?
A. Yes.
Q. Did you notice any photographs in this collection of that?
A. Yes.
Q. Okay. Could you help me find a -- just help me identify which ones are yours.
A. It was the one with Bonnie. That's me.
Q. Okay. This is the bottom of 337. You can see the bridge, obviously, in the distance.
A. That's me.
Q. Also on the bottom of 339, and both photos on 340. Is this y'all's swimming pool on the top of 337?
A. No. That was my neighbor's, Jay Zainey. Do

Page 71

you want me to proceed?
Q. No, sir. I'm --
A. Okay.
Q. -- sorry. I think that I wanted to see your dock, and so --
A. Okay.
Q. -- I think I've seen the pier. Are there additional photos here -- these also of your pier? This is pre-storm --
A. Pre, right. But the -- the pictures with Bonnie and Paul Kiff are also from my pier.
Q. Okay. Earlier you told me where the gazebo ended up being located --
A. Uh-huh (affirmative).
Q. -- and we were looking at page 351 at the bottom. You said it was where those two chairs are?
A. Those chairs and forward towards the house. Yes.
Q. And that's your pier to the left of that photo?
A. Yes.
Q. Okay. Is that like a little Post-it note on there that says pier?
A. I didn't do that, but that -- that is my pier. Yes.
Q. All right. Okay. Do you recall how old the

Page 72

roof was at the time of your purchase of the home?
A. No. I -- I don't recall, but it appeared to be in good shape. And it did not seem to be an issue because I would have pressed the seller.
Q. Did you make any repairs to the roof at any time during the five-year ownership prior to the storm?
A. No.
Q. Okay. Did y'all take any preparations to board up windows or otherwise prepare the house for Hurricane Katrina?
A. Yes, we did.
Q. Okay. Would you describe for me what you did to try to ready the home for the storm?
A. We -- we moved a lot of our contents to the second floor. We also took our -- our -- our boats with us. We boarded up the sliding glass door and brought all lawn furniture and anything that -- anything that we could move, we -- we moved it inside.
Q. How far in advance of the storm was this?
A. Two days. If -- if I recall it hit on Monday. We did this on Saturday.
Q. Okay. I want to discuss with you your personal, I guess, story about Hurricane Katrina. So a couple of days in advance of the storm, where was it your intent to be during the storm?

Page 73

A. A couple of days before, my intent was just to be in Kenner.
Q. Okay. And so the trip over to Mississippi was simply to ready this property in advance of a hurricane?
A. So I would not have to be concerned with readying two properties.
Q. Okay. And once you had prepared the home in Mississippi, as you did, as you described, did y'all go become to Kenner?
A. Yes.
Q. Okay. Were you, in fact, in Kenner when Hurricane Katrina hit?
A. No. As -- as the storm approached, we then prepared the Kenner home, boarding up all ground floor windows, bringing in all of the lawn furniture and preparing the house as best we could.
Q. Sure.
A. And we evacuated to Baton Rouge.
Q. Okay. Did you do that on Sunday?
A. I would imagine we did that, yeah, Sunday afternoon. Yes.
Q. Okay. Did you go to stay with friends, or what were your arrangements in Baton Rouge?
A. The first night we stayed -- first two nights we stayed with my -- my daughter and future son-in-law.

Page 74

Q. Where did y'all go after that?
A. Then we -- it was -- oh, then we stayed a night or two at my -- my -- my daughter's boyfriend's apartment because no one was there. They had gone to Lafayette, so that was available. After the hurricane struck, which was -- well, it's obvious when that happened. When I realized -- I -- I guess I must have gone back to Kenner to see my house, and realizing that it was unlivable, I purchased a condo. I -- I -- I rented two apartments or reserved two apartments, and then eventually gave them to my friends who did not have housing, and I bought a condo.
Q. Okay. And y'all remained in the condo until you moved back into Kenner in October of '06? I believe is --
A. Correct.
Q. -- correct. And claims for expenses incurred during this period of time --
A. Uh-huh (affirmative).
Q. -- after the evacuation before the move-in --
A. Correct.
Q. -- did you claim those under the homeowner's policy on the Kenner property?
A. Correct.
Q. Okay. And I asked you earlier whether you had been paid for your contents and your dwelling, and I

Page 75

understood that it took some time. Were all of your additional living expense incurred as a result of the evacuation -- were those paid to your satisfaction ultimately under the Kenner homeowner's policy?
A. That -- that -- that was debatable the -- the way you worded it. They made me an offer -- one of my many adjusters, and I could -- I needed the money and because my businesses were also affected in -- in New Orleans, so I -- I took his offer just to -- it -- it seemed a little short of -- of what was appropriately due, but I did -- I did settle with that number.
Q. Okay. I feel certain they weren't, but let me make sure. Was there anyone present at the home in Mississippi during the storm?
A. No.
Q. Okay. Do you know of any neighbors who remained at their homes during the storm?
A. Neighbors, no. I -- I did hear of a family that -- that stayed and regretted staying, but, no, I -- just specifically, directly, no.
Q. Okay. No one, in other words, who would have seen exactly what happened at your loss during the storm?
A. That is correct.
Q. Okay. And have you seen any videos, for example, that purport to be of your home or your

Page 76

neighborhood taken during the storm?
A. No.
Q. Okay. Has anyone presented you with any photographs that purport to be Hurricane Katrina in your neighborhood or at your home during the storm?
A. No.
Q. Okay. We looked earlier at the answers to interrogatories.
A. Sure.
Q. I have another question about interrogatory number eight. You'll just see there a listing, (a) through (l), of various videos. Are any of those videos -- you know, have you seen them, are you aware of them, is basically my question?
A. (Examining.) I heard about a St. Stanislaus video. That's the only one, but I never saw it.
Q. Okay. How far is your home from St. Stanislaus?
A. Oh, on the other side of the bay, so a substantial distance.
Q. Okay. All right. Thank you. So am I correct that within a couple of days of the storm you would have returned to the Kenner property?
A. Yes.
Q. How long was it before you came to Mississippi?

Page 77

A. A week, as I recall.
Q. Sure.
A. I -- I -- it was very hectic back then. I -- I don't have an exact date.
Q. Okay. Had you already discussed what you were going to find with neighbors, friends, people who had been to Sandy Hook?
A. I -- I Googled my property at the time it was available on-line, and it appeared -- little did I know I was looking at a slab -- it appeared that it was there, so I was very hopeful.
Q. When you arrived at the property about a week after the storm, who was with you?
A. My wife and son.
Q. Okay. These photographs -- were they taken during that first visit to the property?
A. As I remember, that was my first time there. Yes.
Q. Okay. And when I said these photographs, I wasn't clear, but the ones that we've discussed earlier, Bates 311 through 380.
A. Uh-huh (affirmative).
Q. Your recollection is that you would have taken these photographs on that initial visit to the property?
A. That would be something I would have to check

Page 78

with my wife, whether her and I went, and then we went a second time with my son, or that was indeed our -- our first visit there.
Q. Okay. I follow you. There may have been a trip where it was just you and your wife, and then a subsequent trip that also Jeffery came along on?
A. Exactly.
Q. Okay. How many trips did you make, in total, to the Mississippi property in, say, the first couple of months after the storm?
A. Five.
Q. And after initially seeing the extent of the damage, what were y'all doing at the property on the subsequent visits?
A. Crying.
Q. Did you ever find items of personal property that you were able to recognize and salvage from the loss?
A. There's a table pictured in the foyer, the downstairs foyer.
Q. Sure.
A. It's a -- an iron laid table with a tile top.
Q. On the bottom of page 368?
A. And that is the only thing that we salvaged.
(Witness cries.)
(Off the record.)

Page 79

A. And a couple of dishes.
Q. (By Mr. Tucker) My question, just whenever you're ready --
A. No.
Q. -- about --
A. I'm --
Q. -- the --
A. -- I'm good. I'm good.
Q. The question about the iron table would be whether you found it there near the slab, or whether it was located in some adjacent lot or somewhere else?
A. It was -- as I recall, on the slab, but it was certainly there on my property, and there were other things. There were -- a golf cart, as you can see in the picture, and -- and the handle -- my son is holding the handle of a riding lawnmower. So there was some recognizable things, but the table was the only thing that was of any value.
Q. Right. Okay. When did you first contact State Farm in regards to the Mississippi loss?
A. I -- I am certain that I did it shortly after the visit via a Baton Rouge office.
Q. Okay. Some folks, for example, in Mississippi went to a tent or an emergency set-up. Y'all were able to go to the Baton Rouge office?

Page 80

A. Since I was living there, that's where we went. Yes.
Q. Describe for me as sort of a series of events after that from your --
A. Uh-huh (affirmative).
Q. -- recollection. You report the loss at the Baton Rouge office. What's the next significant event?
A. I -- I was given some money, I think, on both properties for loss of use. And I had to eventually refund the Mississippi dollars because it was not my primary. I don't -- I don't follow the question so good.
Q. Sure. I understand. When you reported to the Baton Rouge, Louisiana, office, did you describe the loss at that time as being a total loss and only a slab remaining --
A. Well --
Q. -- things of that nature?
A. I -- I don't -- well, I don't know how it presented it to them, but I told them, you know, it was -- it was basically gone, just like everybody else's. And did they -- I -- you know, I filed a claim on flood. I filed a claim on homeowner's. And they pretty much -- I say immediately, but certainly happy with the -- the flood response and had those dollars available. I was going to say to purchase the condo -- I already purchased it with a

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

letter of credit from a -- Omni Bank was wonderful.
Q. Okay. You're getting to the answer of what I was trying to --
A. Okay.
Q. -- inquire about, which is after the report and you had given a description to the Baton Rouge office as to what you had seen at the loss --
A. Right.
Q. -- at that time then was the next event -- was it contact by a flood adjuster?
A. Yes.
Q. And that contact was made by phone?
A. Correct.
Q. And there was a discussion, for example, as to a general estimate as to value of contents?
A. Correct.
Q. And once you hit a sufficient number that it exhausted the available contents coverage, he said, hey, hold off, you don't even need to go any further. I can't pay more than my limits. Right?
A. We -- we were past it at the time, and he said, yes, that -- that's enough. He said, there's depreciation in there, too, so you have more than enough. Stop there. We can do this.
Q. Right. And he didn't withhold depreciation on

the flood payments, right? He paid you the full amount of the limit?
A. Because the figure was higher than the limit.
Q. Yes, sir, exactly. I understand.
A. Yes.
Q. All right. So while the flood adjuster and you are -- there's some dealings there, and then --
A. Uh-huh (affirmative).
Q. -- a check is tendered. Was it some time before somebody contacted you about the homeowner's claim?
A. He was the homeowner guy, also.
Q. Okay. He told you I was going to -- he was going to look at both policies?
A. Correct.
Q. All right. Did he provide you with any expectations about coverage under the homeowner's policy?
A. He said they would review it. He alerted me that I was not entitled to any --
Q. ALE?
A. -- ALE. And he said that they would be working on that part, and they would be in touch.
Q. Okay. What was the next event in the adjustment?
A. I do believe I got my flood checks, and then I got a letter denying my homeowner's.

Q. Okay. And when you received that letter, did you contact State Farm to discuss it?
A. I made numerous calls to Steve Saucier's office that were not -- none were returned. I was also dealing with putting my businesses back together, my issues with my home, my Verde property, and taking care of my family, and I just let that slide while I addressed the more pressing issues.
Q. Okay. Did you ever hear back from Mr. Saucier?
A. No. Uh-uh (negative).
Q. Did you ever make any contact with State Farm again in regards to the denial of the homeowner's claim?
A. No.
Q. Okay. Would the next significant step be -- did you attempt mediation or reevaluation of the claim?
A. I did not attempt a mediation or reevaluation because of those issues I just mentioned. That I was dealing with this, and I thought there was -- there would be time to address that. In -- in the -- at some point State Farm contacted me and offered me a -- a settlement of -- I -- somewhere in the $27,000 range, if I remember correctly, and -- and then I told them that was insulting, I guess. Yeah.
Q. I'm going to show you a document. It's --
A. Sure.

Q. -- titled "Mississippi Katrina Resolution Form" --
A. Uh-huh (affirmative).
Q. -- and it's part of plaintiffs' production, Spansel v. State Farm 0273 through 276. I just want you to take a look at it, Mr. Spansel, and tell me --
A. Uh-huh (affirmative).
Q. -- if you recognize that document.
MRS. HURDER: (Examining.)
A. (Examining.) Okay.
Q. (By Mr. Tucker) Do you, in fact, recognize that document?
A. Yes.
Q. And is that your signature and your wife's signature on the fourth page?
A. That is correct.
Q. Okay. The dates of those signatures -- is it June of 2007?
A. That is correct.
Q. Okay. The offer of 27,000 -- did that come after your submission of these Katrina resolution forms?
A. That, I don't know, but I'm sure you -- you would know that better than me.
Q. Okay. My suspicion is that that's a response to your submission of these resolution forms, but I wasn't

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 85

sure if that would also be your recollection that you submitted this information and then got that offer.

A. Oh, I have no recollection of that -- the -- the -- the time -- the timing of that.

Q. Okay. Is it still correct, as represented on the third page of this document, that you've received no moneys from any of other source for this loss? My examples being the MDA or the SBA.

A. No, nothing.

Q. Okay. Before hiring your attorneys, did you ever retain a public adjuster or someone in an attempt to negotiate some sort of a compromise with State Farm?

A. No.

Q. Did you ever retain any sort of a contractor or an engineer or anyone to give you an opinion as to what caused the loss?

A. No.

MR. TUCKER: Let's make this number four.

MRS. HURDER: (Nods head affirmatively.)

(Exhibit 4 marked for identification.)

Q. (By Mr. Tucker) Let me pass you a document now, Mr. Spansel, dated September 28th, 2005. It's made out to you at the Baton Rouge condo address.

A. Okay.

Q. It is produced by plaintiffs in their

Page 86

production, Spansel v. State Farm 0294 through 296.

MRS. HURDER: (Examining.)

A. (Examining.) I -- I find this -- well, that was my adjuster, Avery Murrah. "Based on our phone conversation and other facts, our investigation showed that some of your property was damaged as a result of a storm surge, wave wash, and flood. Unfortunately that damage to your property is not covered under" your -- oh, they're -- they're addressing my homeowner's policy. Okay. Yes, I do. That looks familiar. Yes.

Q. (By Mr. Tucker) When you told me earlier that after you received your payment for the flood damage --

A. Right.

Q. -- you then also received a denial of your homeowner's coverage?

A. Correct.

Q. And you noticed, obviously, that this purports to have included your payments, right?

A. That's quite possible. Yeah.

Q. And so this letter -- do you recall receiving it at that time contemporaneous with the receipt of the flood --

A. Do --

Q. -- payments?

A. -- I recall receiving it, no. The way that

Page 87

letter is worded, it's --

Q. You presume --

A. -- probable --

Q. -- so?

A. -- but I -- I -- I don't recall specifically. Okay.

Q. Did you understand as you read this letter that State Farm was identifying certain causes of loss that were not going to be covered under your homeowner's policy? That that was the purpose for them to quote these sections from your policy to identify causes of loss that were not covered by the homeowner's policy? When he says, unfortunately --

A. Well --

Q. -- these causes of --

A. I --

Q. -- loss are not covered, you understood that he was alerting you to the fact that there would be excluded causes of loss under the homeowner's policy?

A. Well, I see how the -- the letter reads. I wasn't in agreement with that, but I certainly was in a position where my flood payments were -- were needed.

Q. When the property at Sandy Hook had flooded a couple of years before Katrina --

A. Correct.

Page 88

Q. -- you made a claim at that time under your flood policy?

A. That is correct.

Q. Did you understand that those losses were only compensable under your flood policy? That they were not compensable under your homeowner's policy?

A. Yes. Yes, I did.

Q. Okay. And did you understand this letter and Mr. Murrah to be saying that, again, your flood losses are only compensable under your flood policy; they're excluded from coverage under your homeowner's policy?

MRS. HURDER: Objection. Putting words into the witness's mouth.

Q. (By Mr. Tucker) My question is did you understand that? You understood at the time of your first flood loss which policy to make the claim under?

A. I -- I do understand that those are individual policies, and based on the event, you -- you file a claim with a specific policy. When I flooded, it was -- obviously it was rising water, and there was no wind that affected by house. My roof was intact. In -- in the case of Katrina, you -- you would have to have an eyewitness to -- to know exactly what happened. And -- and that is not very untypical of how State Farm went about their business early -- in the early days of Katrina. You're

suggesting that I should not have cashed my -- or deposited my flood claim money?

Q. No, sir. My suggestion would be that in order to recover under both policies, there would need to be damage covered by both policies.

A. Well, in my opinion, there -- there -- there was damage covered by both policies.

Q. Okay. And we're getting to it. My next question would be, you would agree with me that there was flood damage at the property, would you not?

A. Yes.

Q. You made a flood claim. You collected flood money. You agree with me there was flood damage. You also take the position that there was wind damage --

A. Correct.

Q. -- is that correct? Okay. And so we could agree that there was at least this amount, 148,4 in dwelling caused by flood, and at least $100,000 in contents losses caused by flood, correct?

A. At least that number.

Q. Okay. And then what we're here about today is something in excess of those amounts that you would contend were caused by wind? Fair enough?

A. Fair enough.

Q. Okay. To be frank with you, some folks, you

know, would tell me that there was no flood at their property, you know, that it was all a wind loss. But I need to clarify what sort of testimony I can expect from you as a witness if this case were to proceed to a trial.

MR. TUCKER: Let's make this the fifth exhibit.

(Exhibit 5 marked for identification.)

Q. (By Mr. Tucker) Since retaining your attorneys, have you met with any expert or engineer or meteorologist who they may have retained to conduct any sort of an investigation into your loss?

A. No.

Q. Okay. Have you spoken with anyone of that nature by telephone?

A. No.

Q. Okay. Have you reviewed any reports or other materials which may have been generated by any such person?

A. No.

Q. You described for me at the Verde house in Kenner many adjusters being involved in the process.

A. (Witness nods head affirmatively.)

Q. Was that also the case for the Mississippi loss?

A. No.

Q. Did you only deal with Mr. Murrah?

A. Yes.

Q. Okay. And obviously you made calls to Mr. Saucier?

A. Correct.

Q. Okay. Did Mr. Murrah ever offer to meet you in person?

A. I offered to meet him, at which time he -- he said it wasn't necessary.

Q. Okay. Did he explain why he didn't think that that would be necessary?

A. No.

Q. Okay. Was Mr. Murrah always professional and courteous with you?

A. The two times I spoke with him on the phone, he was very much so.

Q. Okay. Did you record any conversations you may have had with Mr. Murrah?

A. No.

Q. The initial payment that you described receiving at the Baton Rouge office -- do you recall it being $2,500?

A. If my memory serves me correctly, I received two equal payments. I do not remember the exact amount.

Q. Okay. And you told me it had to be refunded. Did you actually write out a check and turn it back over?

Is that what you meant by refunded?

A. You know, that -- that is my recollection that I received two payments, and y'all would certainly have -- you -- you -- y'all would have more knowledge of that or -- at -- at hand than -- than I do. And how they got it back, I -- I doubt a wrote a check. I think it was deducted from some future payment.

Q. Yes, sir. Sort of like an advance?

A. Yes.

Q. Okay. So it wasn't -- you know, it wasn't a gift? It was an advance?

A. It was an advance.

Q. Okay. Were you aware that there was a mediation program following Hurricane Katrina which provided an opportunity for insureds to try and resolve their losses short of litigation?

A. Yes.

Q. Okay. Did you consider participating in that mediation program?

A. I understood you would need a -- an engineer, a meteorologist, have video or have something compelling. None of which I had. And State Farm was in the news on a regular basis concerning their handling of Katrina claims in Mississippi, in particular. And I chose to put my time and efforts in rebuilding my business and my home and

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

chose to deal with this later when -- when the air kind of cleared. It was only after receiving the offer that I thought I would eventually receive, even though I got that denial letter, and -- that I -- and that -- and that was after many, many months did I decide to take this particular route. It was not my first choice.

Q. Did you talk with anyone who participated in the mediation program in Mississippi about their experience?

A. I did talk to a -- a friend of mine, Dr. Charles Murphy. However, he came back to a house that was -- he actually came back to a house.

Q. Okay. Did he describe a positive outcome or have a negative experience as a result of the attempted mediation?

A. I -- I -- I surely do not want to speak for him, but the impression is that under his particular set of circumstances, he was content with the outcome.

(Off the record.)

(A short recess was taken.)

Q. (By Mr. Tucker) Mr. Spansel, one of the allegations included in the complaint, which your attorneys prepared and which started the litigation, addresses something called the hurricane deductible. Were you aware that your policy contained or included a

hurricane deductible? If you want, we can look, also, at the --

A. It --

Q. -- Exhibit --

A. -- was in --

Q. -- 3.

A. -- 2005.

Q. You'll see here is where the deductible information is on the left-hand side of that document.

A. I'm -- I'm going to -- yes. I -- I was aware of it. And if you -- if you go back to -- which is the one before the Ivan? I think that certainly Ivan prompted all of the insurance companies to look at their policy differently. Yes.

Q. What was your understanding as to what a hurricane deductible meant?

A. Instead of a standard deductible that typically applies to homeowner's policies, that a -- there would be a percentage deductible.

Q. And that percentage would apply in the event of a named storm, a hurricane?

A. Correct.

Q. Okay. You were not under any impression that the hurricane deductible meant you had coverage for hurricane losses?

A. Say that again.

Q. Sure. I think --

A. That's --

Q. -- it's as funny as you do.

A. Yeah. That's pretty tricky.

Q. Okay. The allegation in the complaint and the allegation made elsewhere in --

A. Okay.

Q. -- this litigation is that this thing called a hurricane deductible --

A. Right.

Q. -- meant that you were covered in the event of a hurricane for any damages that might happen. Did you understand that to be what the hurricane deductible was?

A. Surely y'all would not be offering or writing in a hurricane deductible if you did not plan to keep that deductible when you paid me for hurricane damage.

Q. Yes, sir.

A. Okay.

Q. And, in fact, was it your understanding, that in the event of a hurricane your deductible was going to be higher than it normally would in the event of some other loss?

A. Yes.

Q. Okay. And so there was no misapprehension that

it in some way created coverage? It was just a larger deductible in the event of a hurricane?

A. I wouldn't put it quite like you put it. I bought this policy. It -- it covered hurricanes. It -- certainly -- wind damage, a tornado -- it -- it covered a casualty loss. This little caveat here in case of a hurricane, there would be a higher deductible. Okay. Y'all experienced high losses the previous years. That's legit.

Q. Okay. I think we're on the same page. I follow you.

MRS. HURDER: Are you done with your answer?

THE WITNESS: Yes.

MRS. HURDER: Okay. You get to finish if you had something --

THE WITNESS: Oh --

MRS. HURDER: -- else --

THE WITNESS: -- well --

MRS. HURDER: -- to say, is my point.

THE WITNESS: Okay.

Q. (By Mr. Tucker) Oh --

A. Well --

Q. -- I'm sorry.

A. -- well --

Q. I thought (unintelligible) --

A. -- well, I did -- I did have --
MRS. HURDER: You looked like you had something --
A. I --
COURT REPORTER: One at a time.
A. Okay. I did have one other thought. I said that is legit. The point is that when you purchase this policy, you're purchasing it for a number of casualty losses, and hurricane is one of them.
Q. (By Mr. Tucker) Okay. You understood, did you not, that certain losses were excluded from homeowner's coverage?
A. A flood event?
Q. Yes, sir. We're having one now.
A. Gee.
Q. That's a lot of rain. Well --
A. But I'll go on to say that Katrina was a hurricane.
Q. Yes, sir.
A. Okay.
Q. Katrina was a hurricane. And is there any disagreement between us that part of the Hurricane Katrina event was a flood event?
A. I like the way you phrased that. It -- part was.

Q. Yes, sir.
A. There was also another part.
Q. Okay. And the homeowner's coverage is for the other part?
A. That is correct.
Q. Okay. And the fact that there's a hurricane deductible doesn't mean that it also covers the flood event?
A. Oh, no.
Q. That's the position that's been taken many times.
A. I -- I --
Q. You understand I'm just trying to --
A. Okay.
Q. -- make sure that you're not taking that --
A. I'm aware --
Q. -- position?
A. -- that I have two separate policies.
Q. Okay. And that the hurricane deductible doesn't mean that flood is covered by the homeowner's policy, if it's caused by a --
A. You would --
Q. -- hurricane --
A. -- you --
Q. -- related --

A. -- would --
Q. -- flood?
A. -- need a separate flood policy if you expect to collect on flood.
Q. Okay. Thank you. I noticed in the photographs a number of trees on the property.
A. Uh-huh (affirmative).
Q. Were some trees downed as a result of the storm?
A. I had -- I had a number of pine trees on the property, and I say a number -- I had greater than nine. Don't have that exact calculation. I also had some oak trees on the property. Some pines -- I think there was a pine that was uprooted and down, but most of my pines were snapped, and there should be photos of that in this...
Q. Okay. Do you have any estimate as to the height at which those pines were snapped?
A. Did -- okay. Do -- did I -- do I have that estimate? No. It --
MRS. HURDER: And --
A. There --
MRS. HURDER: -- object --
A. -- were --
MRS. HURDER: -- to the extent it calls for speculation.

A. But -- but I did view it, so I can -- I can answer that they were mid-trunk, mid -- mid -- they were pretty high. I -- I don't know exactly --
Q. (By Mr. Tucker) Yeah.
A. -- you know.
Q. I understand. Let me give you something to compare it to. You know --
A. Uh-huh (affirmative).
Q. -- how sometimes folks are talking distance, they'll say football fields. Well, let's say if you're looking at these, are they one story up, two stories up? If you pictured a house next to those trees, are they two, three stories before the break, if you have an estimate?
A. Yeah. I think it would depend on the height of the pine tree -- the -- the -- at the time of the storm, so I'm going to say it varies.
Q. Were they broken at different heights?
A. Yes.
Q. Okay. It wasn't as though like one shear -- you know, something had sheared them all at the --
A. Well --
Q. -- same height?
A. -- Lucky, to be honest with you, I did not go out there and observe --
Q. Fair enough.

Page 101

A. -- that -- I had other issues on my mind, but -- --
Q. Sure.
A. -- I -- I do understand the question, but I can't specifically answer it.
Q. Okay. Were there any downed trees that actually were on the slab?
A. No.
Q. Okay. One of the other things that is often claimed is emotional distress related to the way that State Farm adjusted the loss or didn't. And my question is: Are you of the opinion that you should be compensated in part for emotional distress related to State Farm's handling of your Hurricane Katrina loss in Mississippi?
A. If this deposition lasts any longer, maybe. I -- I think it's -- it's a shame that I'm in this -- years afterwards still dealing with it. (Witness cries.) I don't know why I'm so -- I apologize. I am -- that wasn't my intent when -- when I contacted an attorney. I -- I wanted what was -- I wanted a fair settlement, a just settlement. And I'm not looking for anything I don't deserve or entitled to or paid for.
Q. The reason I asked the question about the emotional distress is to follow up on the claim. If there is one, what my question then becomes is whether any sort

Page 102

of treatment has been sought. For example, have you seen a counselor or a psychiatrist or even a family physician? And if that becomes a part of the claim, then it's something I either need to address or be able to --
A. No, I have not sought -- and I'm -- no, I have -- I have -- I have not sought anyone. I -- you know, it's -- it's a distressing issue to -- to lose something, and it's no fault of State Farm's that I felt was going to be a legacy and stay in the family. And it's -- but it is distressing to have to -- I've never sued anyone, ever. I don't like the position that y'all have -- have put me in. (Witness cries.)
MRS. HURDER: And for the record, the plaintiff is visibly upset.
Q. (By Mr. Tucker) The only other question, I guess, I really have for you at this time, Mr. Spansel, is whether any estimates for repair or rebuilding have been obtained from any sources by you. Do you understand my question?
A. Yes. At -- at this point it's -- you know, maybe I -- there should have been some homework that I would have done to bring in, you know, a document to make my case look better. But pretty much until this is resolved, it's -- it's -- nothing I can really proceed with good conscience. We -- we will be back, and we'll be

Page 103

back here at some point, but, no, I -- I have not drawn up plans or contracted with anyone. No. I think it would be premature.
Q. And similar to the contents loss --
A. Yeah.
Q. -- the reason that I ask is to try to place some sort of a figure on what we're discussing. There's been a full payment under the flood, and --
A. Right.
Q. -- the limits were very close, you know, the amount of the homeowner's coverage was close to the amount of the flood coverage, so --
A. Okay.
Q. -- I'm trying to determine if you were, in fact, underinsured or not. But you don't have any information today to provide me that would say this is what it will cost to put this house back as it was before the storm? And that's okay, if the answer's --
A. Yeah.
Q. -- no, but --
A. No. The answer's no, and I do not know building cost in Mississippi or what would be required, if there's any code changes or -- no, I do not have that answer.
Q. Okay. Have you cleaned the debris off of the

Page 104

property?
A. We -- we made -- let's see. If I remember right, the -- I think the Corps of Engineers came in at some point after Katrina and cleared the slab and -- and any downed trees. Subsequent to that, to, I guess, be a good neighbor and to expedite the recovery of the area, (witness cries), I -- I had a -- a company come in and remove my slab and drive -- and -- and -- and cut down the pine trees and -- and make -- make the property presentable, I guess.
Q. Okay. How much did you pay for that work?
A. Let's see. We're in 2009 -- 2007 -- I -- I -- I think was 7,500, but I -- I do have that receipt. And -- and it was from a company that had a sign tacked to a telephone pole or something.
Q. Okay. Had you received an opinion from anybody as to whether the slab was reusable or ruined?
A. Oh, no. No, I did not.
Q. Okay. And I believe you told me -- you said, we'll be back.
A. Yeah.
Q. Is it your intent to rebuild a home at this property?
A. We would -- we would love to.
MR. TUCKER: Okay. Mr. Spansel, I very much

appreciate your time today. I thank you for being here and cooperating with me like you did. I have no further questions. I tender the witness.

EXAMINATION BY MRS. HURDER:

Q. I have just a couple of questions.
A. Okay.
Q. I know it's been a long morning.
A. Oh, no. No. I'm -- I'm -- I apologize again for -- this is typically not me, but...
MR. TUCKER: No need.
Q. (By Mrs. Hurder) It's a difficult experience to recount. To be brief, Mr. Spansel, was there anything else about State Farm's handling of your claim that you've not expressed already that you were dissatisfied with?
A. You know, I think at -- at that -- at the time when I was dealing with this, I mean, State Farm was in -- in the news and not so much in a good light. And -- and I knew people were doing mediation, but I -- I never really had -- I never had a video, or -- or there was nothing standing to get an expert witness. So I -- I -- and I chose at that time just to see how things would -- would play out in -- with the -- the hope that at some point they would -- they -- State Farm would -- oh, gosh -- that they -- they would come around. I don't -- I don't know if that's the right word. If it -- I'm having a hard time

expressing. I -- I was hoping, I guess, for some type of settlement offer to which I eventually got, but it was then very disappointing. And I -- I never -- still never had ammunition in the sense of the things, I guess, that -- that they were looking for to -- to go back to them to get them to look at it with a -- oh, I apologize.
Q. That's okay.
A. Look at it with a better eye based on what I lost, and so the whole process is -- is kind of -- the whole -- the whole process is disappointing. I'm sorry for rambling there, but I could have said that much quicker, but -- okay.
Q. No problem. You mentioned there might have been additional renovations to the house between the time you bought it and prior to Hurricane Katrina that you had --
A. Well --
Q. -- not mentioned?
A. -- the -- the -- the only other renovation was -- we had the initial renovation when -- when I collected from -- from the -- the storm/hurricane. I -- the name -- it was -- it was definitely named. I don't -- on -- on the flood, and I think the -- it was 31,000 that we had. We -- we took that as an opportunity to completely renovate the downstairs because at the time of

purchase the -- the -- the renovation was upstairs, you know, porches upstairs and painting throughout, but we -- we did very little to the ground floor. This gave us an opportunity then -- I was -- I had to cut out sheetrock, so we raised electrical outlets. We put a kitchen in downstairs. We renovated the bath area, put in a shower and ceramic tile. And -- and ended up spending close to 50, which was obviously over and above the -- the 31 that we received. And so it -- it was completely redone at -- at the time of the -- at -- at the time of Katrina. Yeah.
Q. Okay. So sometime around 2002, you spent approximately 50,000 renovating the downstairs?
A. And -- and I got -- you know, it was a definitely September event. If you -- if we go and look this up and we find that it's September of 2003, that would not be unreasonable. It was '2 or '3 when we did this renovation. Yes. Uh-huh (affirmative).
Q. One last thing, I'd like to see Exhibit 5.
(Mr. Tucker tenders document.)
MRS. HURDER: Thanks.
Q. (By Mrs. Hurder) Okay. If you would please read the second and third sentence of that first paragraph out loud.
A. Okay. This is addressed to me. "The damage to your property may have been caused by wind and water. We

are continuing to investigate that portion of your loss caused by wind."
Q. Thank you. And what was the date of that letter?
A. September 28, 2005.
Q. Okay. And it was signed by, you said, your adjuster Avery Murrah; is that correct?
A. That is correct.
Q. Okay. Did you ever hear anything else from Mr. Murrah subsequent to that letter regarding his investigation, ongoing investigation?
A. No.
MRS. HURDER: Okay. Thank you. I tender the witness.

FURTHER EXAMINATION BY MR. TUCKER:

Q. Yeah. I'm sorry, Mr. Spansel. I guess Exhibit D to the complaint that was filed in this matter is another letter, and it's -- I agree it's an incomplete letter dated in October 6th of 2005.
A. Okay.
Q. You're welcome to take it. Yet, again, though, is that not another correspondence from State Farm following up on the wind claim? And it's part of what was provided by the plaintiffs in this case.
A. Well, it -- it -- that is correct. This is

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b

Page 109

dated October 8th, and it's -- it's slightly different than the September 28th. But it -- it also says, "This follows our conversation regarding your property where we discussed the damage to your second home residence. The damage to your property may have been caused by wind and water. We are continuing to investigate that portion of your loss caused by wind."

Q. Would it be your recollection, Mr. Spansel, that after receiving this September letter from State Farm, that you contacted Mr. Murrah and had a discussion about the denial of the claim and then an additional letter was sent to you in October just to follow up again on not only providing the basis for the denial, but the fact that if new information was presented, State Farm would be available to consider that?

A. I can't say for sure that there was no contact. I would imagine I -- and it's speculation, but that I may have contacted them based on this letter and said, you know, how -- how can you deny that? It -- it's funny how this is worded, though. This says "Unfortunately" -- and I'm referring to the -- the letter of the -- of September 28th -- "Unfortunately that damage to your property is not covered under the policy identified above." Then we go back about a week later, and the October 6th letter say, "We are continuing to investigate that portion of your

Page 110

loss caused by wind," so it seems to be contradictory. They denied on the 28th, and they're still investigating it on the -- on the 6th.

Q. Yes, sir. I'll just point out to you that that --

A. Sure.

Q. -- unfortunately language --

A. Oh, no. That is also in there, but that's the "Unfortunately that damage to your property is not covered under the policy...above," yeah, is in both letters.

Q. Yes, sir.

A. Anyway, to answer your -- your question, I guess, yeah, here it -- there is another letter.

Q. And would you tell me the last thing that's written in the letter of September, the Exhibit 5? It's on that third page. It's the last thing that Mr. Murrah concludes in his letter.

A. "If you have additional information you would like us to consider you have not previously submitted, or if you desire" an "explanation of this letter, please contact me."

Q. And was any additional information ever submitted to State Farm after that date?

A. Well, I guess seeing this October 6th letter -- "or if you desire any explanation," so it is then quite

Page 111

possible that I did -- now, you know, we're going back four years. But it's -- thereabouts -- you know, I guess it is possible that I did call them looking for an explanation. No, I did not have anything else for him to consider. You have to remember we're -- we're talking a month after the storm.

Q. Yes, sir.

A. What would I have, but --

Q. But State Farm had advised that their investigation remained open as to the wind, and that additional information could be provided. The contents list was not provided. Building estimates were not provided. Expert opinions were not provided. Additional information was not provided after the date of these letters, was there?

A. I never took this -- this wording to be that -- that they wanted estimates of rebuilding. If I've already gave them an estimate in October of rebuilding on that property, I mean, that -- that would be a little foolish. Codes weren't in. Who's going to -- it -- that number would have been astronomical. I -- I took this as y'all were looking for some proof that wind did it, and I -- I don't have that proof. And today, I don't have that proof, so I -- I -- that -- that doesn't seem like a -- a fair assessment of this letter, you know. We're -- we're

Page 112

in 2009, and we can look back, and, you know, read it that way. When I got it, I wasn't reading it that way that he wanted a contents list and a -- an estimate to rebuild.

Q. No, sir.

A. Well --

Q. But my only point is simply that State Farm had indicated the investigation was open, and it ended the letter with a request for any additional information you might have. Now whether that information was available to you or not --

MRS. HURDER: On September 28th they had said that.

MR. TUCKER: Well, you know, I wasn't provided by y'all with a complete October 6th letter, but I promise you that's the language that closes that letter, as well.

A. We're only talking a week's different -- we're -- it says the same -- here's the 28th. Here's October 6th.

Q. (By Mr. Tucker) Yes, sir.

A. What would have changed on my part?

Q. No, sir. You're --

A. What would have been expected of me then?

Q. The only reason I asked another follow-up question of you was that it seemed to me the point had been made that State Farm didn't make any further contact

Page 113

with you about their investigation. And I just want the same point to be made for my client that, in fact, no additional information was provided by the plaintiffs in this case, either, prior to suit being filed. The only thing that was provided was the Katrina resolution form, which we attached here as Exhibit 4, and apart from that, I know of no other information --

A. No --
Q. -- that --
A. -- not.
Q. -- you've provided --
A. No --
Q. -- to --
A. -- I --
Q. -- State Farm?
A. -- I -- okay. Okay. I didn't know exactly where you were headed with that. That -- that is -- that's correct. Yes.
Q. I don't mean to belabor it, but it's --
A. But -- but my -- once again, I was -- and then this may be very naive on my part. But I wasn't aware that the additional information that y'all were requesting was -- my claim was denied, so this additional information is what -- I'm going to put together a contents list or go get a contractor and have him submit a -- a estimate to

Page 114

rebuild when the -- when -- when the -- the claim is denied? It -- it implies to me that you're looking for some magic video eyewitness testimony or some -- or something that -- that it's not in my ability to provide you.

MR. TUCKER: No further questions for you, sir. Again, thank you for your time today.

(Time Noted: 12:58 p.m.)

Page 115

CERTIFICATE OF DEPONENT

I, CHARLES SPANSEL, deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the foregoing 116 pages as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on July 14, 2009, in Bay St. Louis, Mississippi.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

Page Line Comments

This the day of , 2009.

CHARLES SPANSEL

State of Mississippi
County of

Subscribed and sworn to before me, this the day of , 2009.

NOTARY PUBLIC
My Commission Expires:

Page 116

CERTIFICATE OF COURT REPORTER

I, Sherry L. Purvis, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing 116 pages contain a true and correct transcript of the testimony of CHARLES SPANSEL, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the _____ day of July, 2009.

SHERRY L. PURVIS, CSR #1566
My Commission Expires:
May 5, 2010

53baa589-b4cd-42dd-8a9e-d5e2cb23f48b